## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

v.

JUAN CARLOS AHUMADA (01)

       Defendant.

Case No. 14-40088-01-DDC

## <u>MEMORANDUM AND ORDER</u>

Defendant has filed a motion to suppress.  It asks the Court to suppress evidence of contraband found in defendant's car (some 15 pounds of heroin, the government says) and "all statements made by defendant in connection with the search and seizure of defendant and his car."  Doc 14 at 1.  In summary form, defendant's motion asserts that:  (I) a Kansas Highway Patrol ("KHP") Trooper acted unreasonably when he "inferred" that defendant had committed a traffic violation and stopped defendant's car as a consequence; (II) the KHP Trooper lacked reasonable basis to suspect that "criminal activity was afoot," so he lacked justification to detain defendant; (III) the Trooper's warrantless search of defendant's car violated his Fourth Amendment rights; (IV) defendant's consent to a search of his car (which he admits giving) was invalid and, even if valid, the Trooper's search exceeded the scope of any consent; and (V) the contraband discovered by the KHP and defendant's subsequent statements are unconstitutional fruits of a poisonous tree, and the Court, therefore, should suppress them.  *Id.* at 5, 8, 13, 17, and 26.

     The Court conducted an evidentiary hearing on defendant's motion on December 15, 2014.  During it, the KHP Trooper who made the traffic stop, Christopher Nicholas, testified.  In

addition, the government called KHP Trooper Mitch Clark.  Trooper Clark is a member of the KHP assigned as a Task Force Officer to the Drug Enforcement Administration.  Trooper Clark testified that he read defendant's *Miranda* rights to him, defendant waived those rights, and thereafter he participated voluntarily in an interview with Trooper Clark.  Defendant testified briefly.  He also recalled Trooper Nicholas, and he asked the Court to watch a 28-minute video taken from a camera mounted inside Trooper Nicholas' patrol car.  This video showed Trooper Nicholas' pursuit of defendant's car and the subsequent interactions between the Trooper and defendant.  It contains no audio, however.  At counsel's request, the Court watched this video in its entirety before the hearing on December 15, 2014, and based on the parties' arguments at the hearing, the Court has reviewed parts of this video again since the hearing.  Finally, the parties introduced six exhibits and the Court reviewed each exhibit before reaching the conclusions presented in this Memorandum and Order.

After observing the witnesses, hearing their testimony, and reviewing the documentary and video evidence, the Court:  (I) concludes that Trooper Nicholas had reasonable suspicion to believe that defendant had committed a traffic violation; (II) finds that Trooper Nicholas' detention of defendant was narrowly tailored to the reason for that detention; (III) finds that defendant consented to Trooper Nicholas' search of his car and thus obviated the need for probable cause or a warrant authorizing the search; (IV) finds the defendant's consent to the search was validly given and the KHP restricted its search to the scope of consent given; and (V) consequently, concludes neither the contraband allegedly discovered in defendant's car nor his subsequent statements to law enforcement officials is derived from unconstitutional conduct.  As noted below, there is one aspect of defendant's purported statements to law Trooper Clark that

the Court cannot assess based on the current record.  Thus, this ruling does not decide whether this aspect of defendant's purported statements is admissive.  *See* Part IV, below.

Below, the Court recites its findings of fact and then applies the governing law to them.

## Facts

On June 25, 2014, a little after 6:00 in the morning, KHP Trooper Nicholas was driving his patrol car westbound on Interstate 70 in Geary County, Kansas.  He saw a blue, four-door sedan driving the opposite direction on I-70.  The sedan occupied the left lane of the two eastbound lanes.  Trooper Nicholas saw the car remain in the left lane for about three-fourths of a mile, even though there were no other cars in its vicinity and no other lawful reason warranted it remaining in the left lane.  Believing this violated Kansas' traffic laws, the Trooper turned his patrol car around and began pursuing the sedan in the eastbound lanes of the highway.

A short, one-lane construction zone (one-half to three-quarters of a mile long) slowed the Trooper's pursuit of the blue sedan.  After passing through the construction zone, Trooper Nicholas passed another vehicle which had separated him from the blue sedan while the three cars were in the construction zone.  Although the Trooper could not see the blue sedan for the entire time he pursued it, the sedan occupied the left lane during the time it was within his sight. The pursuit covered the next mile and one-half or so following the construction zone.  As before, there were no other cars in the area or obstacles in the right lane to explain the car's presence in the left lane.  In short, Trooper Nicholas had seen the blue sedan operating in the left lane both before the construction zone began and after it had ended (when drivers again could choose between two lanes).

After Trooper Nicholas caught the blue sedan, it moved over to the right lane.  The Trooper pulled alongside the car momentarily for officer safety reasons, slowed down to move

behind it again, and then engaged his patrol car's emergency lights.  The two cars stopped on the shoulder of the interstate highway and, for safety reasons, Trooper Nicholas approached the blue sedan on the passenger side of the car.  The sedan's driver—the car's only occupant—lowered the passenger's window and Trooper Nicholas explained why he had stopped the car:  Kansas law forbids a driver from occupying the left lane of a divided highway unless he is overtaking another car or other circumstances (as specified by the relevant traffic statute) warrant.  The sedan's driver responded, saying he did not know he was violating the law.  He also reported that he had felt safer in the left lane because the right-hand lane was bumpy.  The Trooper asked the sedan's driver for his license and proof of insurance, and advised him that he would not issue a citation for the left lane traffic violation.

During this interaction, Trooper Nicholas noticed an irregularity along the edge of the molding on the car's front windshield.  It was, in the officer's words, "pulled up."  To the Trooper, who had attended and completed an auto body repair school at Dodge City (Kansas) Community College and worked 10 years in the auto body repair industry before joining the KHP, this suggested a recent replacement of the sedan's windshield.  The Trooper also testified that during his tenure with the KHP, he previously had encountered cars with voids, *i.e.*, secret compartments, added to them in the area beneath the windshield and near the cowl (where the windshield meets the dash).  From experience, Trooper Nicholas knew that one could add such a compartment by removing the car's windshield, cutting an access hole near the place where the windshield meets the car's body, installing an access door to the compartment, and then installing a new windshield.  The Trooper also noticed that the sedan's windshield appeared to be brand new.  Before the traffic stop at issue here, Trooper Nicholas had apprehended two other

cars containing such secret compartments.  He also had assisted "two or three" other officers in efforts to identify whether cars contained such compartments.

Trooper Nicholas testified that during the initial detention following the traffic stop, he engaged the sedan's driver in a conversation about his travel plans.  The driver's voice trembled when he spoke and his explanation of his travel plans struck the Trooper as counterintuitive, *i.e.*, I-70 did not represent the most direct route for the city pair disclosed by the driver's professed travel plans.  In addition, the driver said he was driving from Southern California to Kansas City (and back) to see a sister.  The driver said that he had not seen the sister in five years but nonetheless, he planned to spend just two days in Kansas City.

The paperwork provided to Trooper Nicholas identified the driver of the sedan as the defendant in this action, Juan Carlos Ahumada.  Mr. Ahumada's credentials showed he held a California driver's license.  Trooper Nicholas noted that Mr. Ahumada's hands shook visibly when he handed his paperwork to the officer.  Trooper Nicholas returned to his car, checked Mr. Ahumada's license status with his dispatcher, and wrote a warning notice for the left lane violation he had seen Mr. Ahumada commit.

Based on his observations so far, and the incongruities described above, Trooper Nicholas decided to try to engage Mr. Ahumada in a consensual encounter after he had concluded the initial traffic stop.  While the Trooper did not identify the precise moment when he made this decision, he said he based his decision on the totality of circumstances he had seen and heard during the traffic stop, *i.e.*, all the circumstances described above, plus:  Mr. Ahumada had owned the blue sedan for a short time; he was driving alone along a known and high volume drug trafficking route (though the Trooper conceded I-70 was not as high a volume trafficking route as others that Mr. Ahumada might have taken); Mr. Ahumada's trip facts were inconsistent

with normal traffic patterns the Trooper encounters along I-70; and Mr. Ahumada's exhibited an extremely nervous demeanor, even after the Trooper advised that he planned to issue just a warning for his traffic violation.

After Trooper Nicholas had completed his work in his patrol car, he approached the passenger's side window of Mr. Ahumada's car for a second time. He handed the defendant his license and insurance information, and again he noticed that Mr. Ahumada's hands trembled badly. The Trooper's Affidavit, prepared two days after the traffic stop, reports that Trooper Nicholas told Mr. Ahumada "to make sure he drove in the right hand lane [and he] told him to have a safe trip." Doc. 15 at 31. At the hearing, Trooper Nicholas was slightly more equivocal. He testified that he tells the driver "on every traffic stop" that he is free to go after he returns their paperwork, so he "guesses" he said this to Mr. Ahumada. "Something to that effect," the Trooper said. "Have a safe trip. You're free to leave; something to that effect." The Trooper also testified that he usually takes a step or two away from the car window before returning and attempting to engage the driver in a consensual conversation.

The video of this traffic stop[1] shows that Trooper Nicholas followed this practice during his interactions with Mr. Ahumada. It shows Trooper Nicholas take two steps away from the passenger window of Mr. Ahumada's car, back in the direction of the Trooper's patrol car. The video then shows Trooper Nicholas change directions and return to the passenger-side window of Mr. Ahumada's car where, the video also shows, he reengaged the defendant in conversation. Trooper Nicholas was forthcoming about the reasons for his feint back toward the patrol car: It is designed to mark the end of the original traffic stop and begin a new and separate consensual session with the driver.

---

[1] The video contains no audio. During his testimony, Trooper Nicholas explained why. He encountered Mr. Ahumada's sedan before he had reached "range," which the Court understands to mean the area he was assigned to patrol that day. Thus, the Trooper explained, he had not yet placed the remote microphone on his belt.

After reengaging Mr. Ahumada through the passenger-side window, the Trooper testified that he asked Mr. Ahumada whether he could ask him an additional question. Mr. Ahumada responded, "Yes." When the Trooper asked this question, no other law enforcement officers were present, Trooper Nicholas did not have his hand on his weapon, he was not using his "command voice," and he did nothing to suggest that Mr. Ahumada must remain there and talk with him. But Trooper Nicholas concedes he did not tell Mr. Ahumada that he had the right to refuse the Trooper's request to ask another question or, later, his request to search his car. Among other questions he asked during this second stage of his interaction with Mr. Ahumada, the Trooper asked whether there was anything illegal in the car. Mr. Ahumada replied that there was not. The Trooper also asked Mr. Ahumada if he could search the car. Both Trooper Nicholas and Mr. Ahumada agree: Mr. Ahumada consented to the Trooper searching his car. As a safety precaution, the Trooper asked Mr. Ahumada to turn off the car and hand him the keys. He did so. Mr. Ahumada then stepped out of the car, the Trooper checked Mr. Ahumada for weapons, and then asked him to go stand in front of his sedan.

Trooper Nicholas then began inspecting the car more closely. He focused his inspection on the area around the anomaly he had noticed near the front windshield. He eventually opened the sedan's hood and examined the area near the cowl and the car's windshield wipers. While examining the windshield area more closely, Trooper Nicholas noticed that the molding on the driver's side of the windshield was loose. Also, it appeared someone had attempted to glue it down with urethane. This did not conform to best practices in the auto body repair industry, the Trooper testified. He said that most auto repair shops would not "let a windshield go [out] with the corners rolled up" like the ones he saw on Mr. Ahumada's windshield. The Trooper also noticed signs suggesting that the windshield was installed recently. For example, the dashboard

7

area near the bottom of the windshield was unusually clean and lacked the customary accumulation of lint and dirt the Trooper would expect to see if the windshield had not been replaced recently.  Mr. Ahumada told the Trooper he had purchased the car about four months earlier and he had not had the windshield replaced since he owned it.

The Trooper also noticed tool marks on several nuts near the cowl/firewall area and he saw new, after-factory paint on the plastic pieces around the cowl screws.  He asked Mr. Ahumada several times if he had done any work on the car, and he consistently replied that he had not.  Finally, the Trooper noticed that Mr. Ahumada faced away from the car while the Trooper closely examined this area of the car.  This was unusual, the Trooper said, because most drivers will watch their car closely while a Trooper inspects it.

At this point, the Trooper concluded that probable cause existed to believe that the car contained a secret compartment near the cowl/firewall area.  Because Trooper Nicholas was still working by himself, he placed Mr. Ahumada in handcuffs for safety's sake.  About five minutes after he applied the handcuffs to defendant, a second officer arrived at the scene.  Trooper Nicholas testified that Mr. Ahumada never withdrew his consent to the Trooper's search, never asked him to stop the search, and never complained that the search was exceeding the scope of his consent.  When he testified, Mr. Ahumada did not assert that he had ever objected to the Trooper's search.

Based on his observations, Trooper Nicholas retrieved an electric drill he carries in his patrol car and used it to drill a small hole (one-quarter inch in diameter) in the area where he had come to believe a secret compartment existed.  The Trooper explained that he drilled this hole to determine if, in fact, the car contained a secret compartment there.  This hole, the Trooper testified, did not threaten the sedan's structural integrity or subtract from its operational capacity

or market value.  The Trooper also testified that auto repair workers commonly drill similar holes when making repairs so they can insert tools in tight spots.  The Trooper concedes that he did not ask Mr. Ahumada, specifically, whether he consented to the Trooper drilling the small hole.

Once he had drilled the hole, Trooper Nicholas inserted a fiber optic scope through it and looked beneath the surface he had drilled.  The scope enabled Trooper Nicholas to see several packages wrapped in cellophane.  From this, the Trooper concluded that the packages inside the compartment likely included drugs.  He placed Mr. Ahumada under arrest and, defendant concedes, read him his *Miranda* rights.  Mr. Ahumada orally confirmed that he understood his rights.  The Trooper then placed Mr. Ahumada in his patrol car but did not ask him to waive his rights.

The KHP arranged to tow Mr. Ahumada's car to KHP Headquarters near Topeka, Kansas.  The KHP summoned Safelite, an automotive glass vendor, and its employee removed the blue sedan's windshield.  This enabled Trooper Nicholas to remove the cellophane-wrapped packages he had seen through his optical scope.  He conducted a field test on a sample taken from one of the packages.  It tested positive for heroin.  In addition, the Trooper's report states that the nine packages the Trooper removed from Mr. Ahumada's car weighed 15 pounds, two ounces (including the weight of packaging).

About two hours after Mr. Ahumada's arrest, he met with KHP Trooper Mitch Clark. Trooper Clark was working under an assignment to a Task Force operated by the federal Drug Enforcement Administration.  In this role, Trooper Clark assisted KHP officers and others in drug interdiction efforts.  Trooper Clark testified he read Mr. Ahumada all of his *Miranda* rights from a prepared form.  Mr. Ahumada told Trooper Clark that he understood his rights, wanted to waive them, and was willing to talk with him.  Trooper Clark also testified that KHP

9

"customarily" secured a signed statement showing the interviewee had waived his *Miranda* rights, but he could not remember whether Mr. Ahumada actually signed a waiver form.  Trooper Clark also testified that the KHP video-taped the session where the KHP asked Mr. Ahumada questions.  Neither party provided the Court with the form that Trooper Clark used to read Mr. Ahumada his *Miranda* rights, any waiver form Mr. Ahumada may have signed, or the video of Trooper Clark questioning the defendant.  But Trooper Clark testified, without objection, that he had watched this video recently and it captured Mr. Ahumada's pre-interview waiver of his rights.  Finally, Trooper Clark testified that Mr. Ahumada never told him that he did not wish to speak with him any longer or that he wished to speak with an attorney.

In the interview that followed, Mr. Ahumada told Trooper Clark that a man had approached him and asked whether he was "working."  Mr. Ahumada said he understood the man's question to inquire whether he was transporting drugs.  Mr. Ahumada refused this entreaty, but later, when he had gone without work for a time, the same person approached him again.  This time, Mr. Ahumada told Trooper Clark, he accepted the employment proposal.  He told Trooper Clark that he had expected a payment of $1,000 for the trip that led to his address. Mr. Ahumada also said he did not know his final destination when Trooper Nicholas stopped him on I-70.  Instead, he said he was instructed to drive to Kansas City and wait for a phone call with additional instructions.  Trooper Clark testified that Mr. Ahumada said he did not place the contraband in the sedan's secret compartment.  Instead, the person who had approached him about transporting drugs had taken his car from him for about three weeks' time and then returned it.  Thereafter, he left on the trip that led him to Kansas and his encounter with Trooper Nicholas.  Mr. Ahumada said he was supposed to deliver the car and fly back to California. Finally, Mr. Ahumada told Trooper Clark that this trip was his first time transporting drugs.

Mr. Ahumada also participated in a second interview with Trooper Clark.  He told

Trooper Clark that he didn't wish to cooperate with police authorities and he would just go to

jail.  Trooper Clark later engaged Mr. Ahumada in conversation a third time.  While defendant's

motion seeks to suppress any statements he may have made during this third stage of his

interactions with Trooper Clark, the current record does not permit the Court to decide this

aspect of his motion.

## Legal Analysis

The following five sections address the five principal attacks Mr. Ahumada makes in his

motion.  They address defendant's arguments in the same order he makes them in his

Memorandum of Law (Doc. 15).

## I.      TROOPER NICHOLAS HAD REASONABLE SUSPICION TO BELIEVE A TRAFFIC VIOLATION HAD OCCURRED.

To begin, the defendant's Memorandum asserts that Trooper Nicholas lacked a

constitutional basis for stopping Mr. Ahumada's car on Interstate 70.  The evidence quickly

dispatches this argument.

Mr. Ahumada concedes that a traffic stop, at most, requires "an observed traffic

violation" or an officer's "reasonable [and] articulable suspicion that a traffic or equipment

violation has occurred or is occurring."  *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir.

2009) (cited by defendant, Doc. 15 at 6).  *See also United States v. Callarman*, 273 F.3d 1284,

1287 (10th Cir. 2001) (synthesizing cases holding that probable cause is "sufficient ground for a

stop" but noting that it is not "necessary for a stop" and a "reasonable articulable suspicion" is

also sufficient).  Simplifying the task here, the believable evidence satisfies both touchstones.

The Trooper testified that he saw Mr. Ahumada drive his vehicle in the left-hand lane of

the two eastbound lanes of I-70.  He saw him remain in that lane for about three-fourths of a mile

before Mr. Ahumada entered a construction zone, and continue again in the left lane for a time after he had passed through the one-lane construction zone.  The videotape confirms about 33 seconds of Mr. Ahumada driving in the left-lane which, at the posted speed limit of 75 m.p.h., covered another one-half mile or so.  The testimony and video evidence established that no other car or road condition forced the defendant into that lane.

K.S.A. § 8-1522(c) governs divided highways that consist of two lanes running in the same direction outside of any city limits in Kansas.  It requires Kansas drivers to occupy the right-hand lane of such a divided highway unless they are overtaking (passing) another vehicle, preparing to turn left, directed into the left lane by official traffic-control devices, or otherwise required to drive in the left lane by another provision of Kansas law. *Id*.  The credible evidence establishes that Mr. Ahumada violated this provision.  He drove for long-stretches in the left-hand lane of I-70 without any of the excuses recognized by this statute's four exceptions.

Mr. Ahumada's Memorandum makes just one attempt to displace Trooper Nicholas' conclusion that he had seen the defendant's car commit a traffic infraction.  Mr. Ahumada argues that no highway marker or signage redirected him to return to the right-hand lane after the one-lane construction zone had ended.  But this argument misapprehends Kansas law.  By statute, a driver who drives on a two-lane stretch of divided highway in the Kansas countryside must occupy the right lane unless one of four exceptions specified in the statute exists.  None of the exceptions existed here.  Kansas had no duty to post a sign redirecting Mr. Ahumada to the right-hand lane because Kansas' statute already had conveyed this command.  He is presumed to know the law, this statute included, and his ignorance of it is no defense. *State v. Young*, 614 P.2d 441, 445 (Kan. 1980) ("all persons are presumed to know and are bound to take notice of general public laws of the state").

Finally, the Court notes that Mr. Ahumada's attack on Trooper Nicholas' traffic stop is inadequate for another, independent reason. The defendant's Memorandum argues that Trooper Nicholas had no good reason to stop him and thus, the purported "[f]ailure to understand the law by the very person charged with enforcing it is not objectively reasonable." Doc. 15 at 8, (*citing Sherouse v. Ratchner*, 573 F.3d 1055, 1059 (10th Cir. 2009)). As the Court already has noted, Trooper Nicholas correctly applied K.S.A. § 8-1522(c) when he stopped Mr. Ahumada. But even if the Trooper had made the error in legal reasoning that defendant attributes to him—that is, Mr. Ahumada was entitled to but did not receive notice from a highway sign reminding him to return to the right-hand lane after a one-lane construction zone ended—this would not nullify the traffic stop's propriety.

In *Heien v. North Carolina*, the Supreme Court considered whether an officer's mistaken belief about the duty imposed by a traffic law requires a federal court to suppress evidence gathered during a subsequent traffic stop. 135 S. Ct. 530 (2014). In that case, a police officer stopped a North Carolinian because only one of his car's two stop lamps was working. The subsequent traffic stop produced evidence that led to the driver's conviction on cocaine trafficking charges. The North Carolina trial court refused to suppress the evidence derived from the traffic stop, but the state's court of appeals reversed. It held that North Carolina law only requires "a stop lamp"—one stop lamp —and the defendant's car had one working stop lamp. Thus, the court of appeals held, the officer stopped the defendant's car based on an erroneous understanding of state law, this legal error made the traffic stop objectively unreasonable, and this required the court to suppress the evidence derived from the stop. The Supreme Court of North Carolina reversed, holding that even if *Heien*'s defendant had committed no traffic

violation, the officer's "mistaken understanding of the law was reasonable" and so the stop was valid. *Id*.

The Supreme Court granted certiorari and it affirmed the state supreme court's decision refusing to suppress the contraband discovered during the traffic stop. Its reasoning eliminates the very argument Mr. Ahumada makes here, *i.e.*, that the Trooper's hypothetical misunderstanding of the Kansas traffic laws is, by definition, "objectively unreasonable." *See* Doc. 15 at 8, *citing Sherouse v. Batchner*, 573 F.3d 1055, 1059 (10th Cir. 2009). As *Heien* explains, "But just because mistakes of law cannot justify either the imposition or the avoidance of criminal liability, it does not follow that [such mistakes] cannot justify an investigatory stop … Here we have little difficulty concluding that the officer's error of law was reasonable … And because the mistake of law was reasonable, there [still] was reasonable suspicion justifying the traffic stop." *Heien*, 135 S. Ct. at 540.

Consequently, even if Kansas law owed Mr. Ahumada a sign telling him that he must return to the right-hand lane after the one-lane construction zone ended but failed to provide that notice, it would not render Trooper Nicholas' traffic stop illegal. Trooper Nicholas had to make factual assessments and apply his understanding of Kansas law while driving at interstate highway speed. In this crucible, the error of law defendant attributes to him would be an objectively reasonable one. And *Heien* thus provides yet another reason to overrule defendant's challenge of the traffic stop.

## II.     THE FACTS DEMONSTRATE THAT TROOPER NICHOLAS' DETENTION OF DEFENDANT WAS NARROWLY TAILORED TO THE REASON FOR THAT STOP.

As Part I explained, Trooper Nicholas reasonably suspected Mr. Ahumada had violated Kansas' traffic laws. The video capturing this traffic stop establishes that the resulting detention was reasonable. Using the clock shown in the video, this is the relevant chronology for the stop:

- 2:05:   Trooper Nicholas activates his emergency lights instructing Mr. Ahumada to stop his vehicle.

- 2:19:   Mr. Ahumada and Trooper Nicholas' vehicles come to a stop on the highway's right shoulder.

- 2:30:   Trooper Nicholas reaches the window alongside Mr. Ahumada's car.

- 3:55:   After securing Mr. Ahumada's license and attendant paperwork, Trooper Nicholas arrives back in his patrol car.

- 7:25:   Having checked the bona fides of Mr. Ahumada's license with the KHP's dispatcher, Trooper Nicholas returns to the window of Mr. Ahumada's car.

- 7:47:   Trooper Nicholas returns Mr. Ahumada's paperwork and disengages from him briefly, taking a few steps away from his sedan and thus ending the compelled detention following the traffic stop.

In sum, Trooper Nicholas' traffic stop detained Mr. Ahumada for about five minutes and 17 seconds.[2]

The Court holds that such a modest detention complies with the requirement that law enforcement officials must tailor the scope of any compulsory detention carefully to its underlying justification.  *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003) ("An investigative detention usually must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification.") (internal quotation marks omitted).  The Tenth Circuit has explained what this means.  "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."  *United States v. Hunnicutt*, 135 F.3d 1345, 1349

---

[2] The government's Response attributes slightly different time markers to the video.  *See*, *e.g.*, Doc. 16 at 11 (arguing that the traffic stop ended at "7:19" on the clock shown by the video).  These differences are minor and immaterial to the conclusions the Court draws.

(10th Cir. 1998).  This is precisely what Trooper Nicholas did here—though he exercised his discretion to issue a warning to Mr. Ahumada instead of a citation.

Moreover, the governing precedent in our Circuit permitted Trooper Nicholas to ask Mr. Ahumada about his travel plans during this detention.  "Under this Court's precedents, as part of a legitimate traffic stop a law enforcement officer is permitted to ask a motorist about 'travel plans.'"  *United States v. Santos*, 403 F.3d 1120, 1131-32 n.6 (10th Cir. 2005) (citing *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) ("[Q]uestions about travel plans are routine and may be asked as a matter of course without exceeding the scope of a traffic stop.") (internal quotation marks omitted)).

The video confirms the length of time required to complete this process.  It was not excessive.  The Court finds that Trooper Nicholas' detention of Mr. Ahumada was reasonable in both duration and scope.  Also, it was narrowly tailored to the traffic violation the Trooper had observed.  It was consistent with our Circuit's precedent.

## III.    DEFENDANT'S CONSENT OBVIATED THE NEED FOR PROBABLE CAUSE OR A WARRANT TO SEARCH HIS CAR.

Mr. Ahumada next argues that Trooper Nicholas violated his constitutional rights by conducting a warrantless search of his car.  The factual predicate of this argument is undisputed, for everyone agrees Trooper Nicholas searched the defendant's car without securing a warrant.  But other undisputed facts established a proper basis for Trooper Nicholas to do so.

Trooper Nicholas testified that after he had checked Mr. Ahumada's license and registration with KHP's dispatcher, he returned Mr. Ahumada's documentation to him.  The video shows the Trooper approach Mr. Ahumada's car again and return his paperwork to him.  The Trooper testified that he then said something along the lines of, "You're free to go," or "Have a safe trip."  Mr. Ahumada testified and he never controverted this exchange with the

Trooper.  The video of the traffic stop also shows the Trooper step away from Mr. Ahumada's car and take two steps back toward his patrol car.  The Trooper then reversed his course, returned to Mr. Ahumada's window and asked the defendant if he could ask him some questions.  Mr. Ahumada agreed to answer the questions, the Trooper testified.  During his testimony, Mr. Ahumada did not challenge the Trooper's testimony.  The Trooper then asked the defendant if he could search the car.  The testimony from both Trooper Nicholas and Mr. Ahumada confirms that Mr. Ahumada explicitly consented to a search of his car.

This conduct and the uncontroverted oral exchanges converted the Trooper's second encounter with the defendant into a consensual one.  *See*, *e.g.*, *United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006) ("Phrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart . . . Trooper Ranierri's words of farewell suggested that any subsequent discussion was consensual"); *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997) (absent other indicia of coercion, detention became consensual once the officer handed the driver a citation and returned his paperwork even though the officer did not explicitly say the driver was free to go); *United States v. Elliot*, 107 F.3d 810, 814 (10th Cir. 1997) (same); *United States v. Werking*, 915 F.2d 1404, 1409 (10th Cir. 1990) (same).

The challenge presented by Mr. Ahumada requires the Court to make a "refined judgment" based on "the totality of the circumstances."  *Manjarrez*, 384 F.3d at 884 (citing *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999)).  All of the evidence simplifies this task here.  Mr. Ahumada testified, and even he agrees that he consented both to answering Trooper Nicholas' additional questions and to the Trooper searching his car.  Inferentially, the video evidence confirms as much.  It shows that Mr. Ahumada got out of his car and stood by

while Trooper Nicholas searched.  Mr. Ahumada's testimony included no assertion that he withdrew his consent or ever objected to any aspect of the Trooper's search.  Also, the video does not show any evidence that the defendant objected to the Trooper's search.  This conduct is highly probative that defendant actually consented to the Trooper's search (something Mr. Ahumada does not deny) and that the search remained within the scope of the consent he had conveyed.  *See United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) (Affirming district court's refusal to suppress evidence acquired during an allegedly consensual search and observing, "Failure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent.").

Likewise, Mr. Ahumada's complaints about the absence of a search warrant are misplaced.  Trooper Nicholas did not need a warrant because even defendant agrees that he consented to the search of his car.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *United States v. Gonzales*, 520 Fed. App. 720, 722 (10th Cir. 2013) (same).

## IV.    DEFENDANT'S CONSENT WAS VALIDLY GIVEN.

Mr. Ahumada next attacks the validity of the consent he admits giving, dividing his argument into three parts.  The Court addresses each part, below, in the order his brief presents them.  *See* Doc. 15 at 17-26.

### A.  The government has carried its burden to show that Mr. Ahumada voluntarily consented to the search of his car.

Mr. Ahumada's motion gets to the wrong answer because it starts in the wrong place.  He starts by arguing that the government faces an enhanced burden because Mr. Ahumada consented to the search after the government had detained him illegally.  *See* Doc. 15 at 18.  The Court

already has rejected the premise of this argument, finding that:  Trooper Nicholas had both

probable cause and reasonable suspicion to stop the defendant's car; the length and scope of the

resulting detention was properly tailored to its justification; and Mr. Ahumada consented to the

questioning and search that followed his five minutes of detention.  Thus, the Court rejects

defendant's original premise that the government faces an enhanced burden here.

The substance of Mr. Ahumada's arguments fare no better.  Defendant asserts that his

consent is invalid because the government failed to prove any of the factors required for valid

consent.  *See* Doc. 15 at 19-20 (arguing factors identified in *United States v. Jones* 701 F.3d

1300 (10th Cir. 2012)).  As defendant correctly points out, the government's assertion that he

consented to the search requires the government to prove that the defendant "either express[ly] or

implied[ly] consent[ed]" to the search and did so "voluntarily and freely."  *Id.* at 1317-18.  Our

courts determine whether a citizen has given such consent based on "the totality of the

circumstances," *id.* at 1318, and the relevant factors include:

> physical mistreatment, use of violence, threats, promises,
> inducements, deception, trickery, or an aggressive tone, the
> physical and mental condition and capacity of the defendant, the
> number of officers on the scene, and the display of police weapons.
> Whether an officer reads a defendant his *Miranda* rights, obtains
> consent pursuant to a claim of lawful authority, or informs a
> defendant of his or her right to refuse consent also are factors to
> consider . . .

*Jones*, 701 F.3d at 1318 (citing *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006)

(internal quotation marks omitted)).

Here, as the Court already has explained, no controversy exists whether the defendant

expressly consented.  Trooper Nicholas said he did.  The defendant said he did.  This leaves only

the question whether this consent was given voluntarily and freely.  Considering all the factors

identified in *Jones* and the totality of the circumstances established by the evidence, the Court finds Mr. Ahumada gave his consent freely and voluntarily.

Conversely, no evidence suggests anyone physically mistreated, deceived, or tricked the defendant. No one used (or threatened to use) violence, or made any promises or offered any inducements. No one talked to the defendant in an aggressive tone or displayed police weaponry. Nothing suggests that defendant's condition or capacity interfered with his ability to understand what Trooper Nicholas had asked him to approve. Two more of the *Jones* factors favor the same conclusion, *i.e.*: Trooper Nicholas never asserted he had a lawful right to search the defendant's car even without his consent, and the Trooper was the only officer on the scene when Mr. Ahumada consented to the search of the car.[3] Thus, these factors all favor a finding that Mr. Ahumada gave his consent freely.

This leaves just two more *Jones* factors and the evidence is likewise unchallenged as it applies to them. Trooper Nicholas did not read Mr. Ahumada his *Miranda* rights until after he had found the secret compartment. In addition, the Trooper concedes that he did not expressly inform the defendant of his right to decline the request to search. These factors disfavor a finding that Mr. Ahumada's gave his consent freely and voluntarily, but they are insufficient to outweigh the nine factors favoring a finding that Mr. Ahumada freely and voluntarily consented. First, and though the Court understands that *Jones* does not adopt a numerical standard that tallies the pros and the cons, the balance here is one-sided. Accordingly, it does affect the Court's evaluation of the totality of the circumstances and weighs heavily for a finding that Mr. Ahumada's consent was valid. Second, in our Circuit, the disclosure of the right to decline a

---

[3] Trooper Nicholas testified that he sought, and received Mr. Ahumada's consent before he asked him to step out of his car. The Trooper's testimony and the video establish that the second officer arrived on the scene after the defendant had gotten out of his car. Thus, the only logical inference is that Mr. Ahumada gave his consent while just one officer was present on the scene. When he took the witness stand, Mr. Ahumada did not dispute this timeline.

search is not an essential element of valid consent.  *Manjarrez*, 348 F.3d at 886 ("A police officer does not have to inform the citizen they are free to disregard any further questioning for the encounter to be consensual.").  Third, an "officer's request to search a defendant's automobile does not constitute interrogation invoking a defendant's *Miranda* rights   . . . Thus, officers may, following a voluntary consent to search, search a vehicle or portion thereof without first apprising the owner of the vehicle of his rights under *Miranda*."  *United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994).  The totality of the circumstances here are far less coercive than those presented in *McCurdy*, *see id.* at 1112-13, and there, the Tenth Circuit reversed a district court's order suppressing fruits of a consensual search.

More specifically, the *McCurdy* defendant consented to a search of his truck only after multiple officers had apprehended him with their weapons drawn, detained him for three hours, threatened "to 'come down real hard' on him" if he did not admit his association with the crime, and twice pushed him to the ground on his knees.  After all this, the Circuit reversed the trial court's order suppressing evidence located during a consensual search of the defendant's vehicle. It remanded the case for fact-finding about the validity of defendant's search in light of the factors embraced by *Jones*.  *Id.* at 1119.  As noted above, the circumstances here fall far short of those presented in *McCurdy* and even those more coercive circumstances did not preclude a finding of valid consent.

Finally, most of defendant's arguments on this issue begin with the premise that the KHP did nothing to "purge the taint of the illegal stop and detention from the subsequent [consensual] search and seizure."  *See generally* Doc. 15 at 21-23.  As the Court already has explained, Trooper Nicholas' stop of Mr. Ahumada's sedan was a legal one and he concluded that brief detention before he solicited his consent to search his car.  The video shows Trooper Nicholas

stepping away from Mr. Ahumada's window and then returning to reestablish contact with him. Moreover, our Circuit has recognized that returning a driver's license and other paperwork is sufficient to manifest the end of detention.  *See, e.g.*, *United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007) (defendant gave voluntary consent to search even though officer did not explicitly inform defendant he was free to leave because officer had returned paperwork, thanked defendant and walked away before returning to ask further questions).

In sum, the Court finds from the totality of the circumstances that the defendant consented to Trooper's Nicholas' search of his car.  And it finds that the weight of the *Jones* factors favor a finding that he gave his consent freely and voluntarily.  The Court thus rejects Mr. Ahumada's argument that his consent to the search was not valid.

**B. Trooper Nicholas did not exceed the scope of Mr. Ahumada's consent when he drilled a small hole into the area where, according to objective indicators personally observed by the Trooper, a secret compartment appeared to exist.**

Defendant next contends that even if he validly consented to a search of his car, he was not asked and never consented to a search that encompassed an officer drilling into his car.  Doc. 15 at 24-25.  Mr. Ahumada's opening brief presented this argument, but did not support it with citation to any authority.  The Court requested supplemental briefing on the drilling issue and the parties complied.  *See* Doc. 20 (defendant's supplemental Memorandum of Law) and Doc. 21 (government's).  Mr. Ahumada's supplemental brief, like his original one, cites no federal authority for his proposition that the authority to search does not encompass the authority to drill in the limited fashion Trooper Nicholas used here.  But to his credit, Mr. Ahumada's supplemental brief recognizes that our Circuit has upheld an officer's use of a drill during a consensual search.  *United States v. Gregoire*, 425 F.3d 872 (10th Cir. 2005).  *Gregoire*, and the cases it cites, refute defendant's position.

In that case, an officer stopped a van for a traffic violation.  After talking with its driver, the officer concluded that the driver's statements about his whereabouts and travel plans were suspicious.  He also detected the scent of an air freshener.  *Id.* at 874.  After completing the traffic stop, he engaged the driver in a consensual conversation and then asked for permission to search his van.  The driver agreed.  The officer noticed that the bolts fastening the rear seat appeared to have been removed several times, the carpet was installed loosely and was buckled, and it had pulled away from the molding that normally covers it.  The officer knew that a large gap existed between the floor and the bottom of the chassis in this particular model of van. "Thereafter, the trooper drilled two small holes in the floor, but did not discover the contraband until he chipped away some of the undercoat that covered the bottom of the compartment."  *Id.* 875.  This let him see a non-factory weld holding a piece of sheet metal in place.  The officer then pried the sheet metal back and discovered a package containing contraband.  *Id.*

After pleading guilty but preserving his right to appeal the district court's decision denying his motion to suppress, the defendant appealed.  The Circuit affirmed the trial court's suppression order and its reasoning applies with equal force here.

> We approach this issue from the perspective of what a reasonable innocent person would perceive . . . A reasonable innocent person advised of a strong suspicion of a false compartment in the vehicle could very well expect a more invasive search to ascertain the contents of the compartment.  We have upheld similar searches involving the partial dismantling of a vehicle pursuant to general consent when the defendant did not object.

425 F.3d at 880-81.  Tellingly, *Gregoire* cites a string of cases that affirmed similarly invasive consensual searches.[4]  Applying *Gregoire*'s reasoning to the facts at hand leads the Court to

---

[4] 425 F.3 at 81 (citing *United States v. Marquez*, 337 F.3d 1203, 1206, 1208-09 (10th Cir. 2003) (prying nailed-down plywood from RV bench, and unscrewing second plywood covering); *McRae*, 81 F.3d at 1537 (lifting of trunk

reject Mr. Ahumada's argument. It finds that drilling one small, non-destructive hole into the cowl of his car did not exceed the expectations of a reasonable, innocent person.

Alternatively, defendant contends that even if he conferred valid consent for some kind of search, Trooper Nicolas exceeded the scope of that consent by applying the small power drill to create a one-quarter inch hole in the firewall area. Doc. 15 at 24. In general terms, "the scope of consent is based on 'objective reasonableness.'" *United States v. Pena*, 143 F.3d 1363, 1367-68 (10th Cir. 1998); *see also*, *United States v. Roman-Roman*, 116 Fed. Appx. 994, 997-98 (10th Cir. 2004), *rev'd on other grounds*, 546 U.S. 930 (2005). Also, the scope of a consensual search must adhere to the "breadth of the consent given." *United States v. Elliott*, 107 F.3d 810, 814-15 (10th Cir. 1997).

Here, the testimony about the scope of the consent Mr. Ahumada gave is not defined by bright lines. Trooper Nicholas testified that he asked the defendant whether he could "look around" in his car. Mr. Ahumada testified that the Trooper asked to "search my car" and "I said ok." Perhaps the best indicator that the search did not exceed the defendant's consent— including the Trooper's use of a small drill—is found in defendant's conduct. Mr. Ahumada never objected to any aspect of the Trooper's search or the means he used to search the parts of the sedan he searched. A defendant's "[f]ailure to object to the officers' [search of a part of the suspect's motel room] 'may be considered an indication that the search was within the scope of consent.'" *Pena*, 143 F.3d at 1368 (quoting *Espinosa*, 782 F.2d at 892 (Upholding finding that search conformed to consent and reasoning, "At no time [during a 14-minute search] did defendant attempt to retract or narrow his consent.")). All the credible evidence here favors the same conclusion here.

---

carpet held in place by fastener); *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994) (removing screws from strip holding down carpet which revealed false compartment in van); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) (lifting up loose part of car's quarter panel)).

Mr. Ahumada testified.  He never asserted that he objected to any aspect of Trooper

Nicholas' search of his car.  *See Espinosa*, 782 F.2d at 888 (affirming refusal to suppress

contraband found during consensual search and noting that though defendant had testified, he

never addressed scope of consent issue).  The Trooper testified.  Likewise, none of his testimony

suggests that defendant ever expressed concern about the search.  Accordingly, the Court finds

from the credible evidence that Trooper Nicholas' search of Mr. Ahumada's sedan remained

within the consent he admits he gave.  This includes the Trooper's use of a small drill so that the

Trooper could see into the area where he suspected a false compartment existed.[5]

Mr. Ahumada invokes *United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000) (cited

in Doc. 20 at 7), arguing that its holding is inconsistent with using a drill and a scope to see into

a secret, post-factory compartment added to a car.  In *Osage*, officers boarded a train and asked a

passenger for permission to search his locked luggage.  The passenger consented and provided

the key needed to open one of the suspect's travel bags.  Inside one bag, the officer found a

plastic grocery sack containing four, 28 ounce cans labelled, "tamales in gravy."  To the officer,

it appeared that someone had tampered with one of the cans, and the can did not feel or sound

like it contained what its label said it was.  The officer then used his Leatherman tool to open the

can and once he had accessed the can, he found methamphetamine instead of tamales or gravy.

Our Circuit reversed the District Court's order refusing to suppress the contraband found in the

can.  It reasoned that "before an officer may actually destroy or render useless a container which

would otherwise be within the scope of a permissive search, the officer must obtain explicit

---

[5] Affirming searches based on reasonable suspicion, courts have upheld far more intrusive means than Trooper Nicholas used here.  *See, e.g.*, *United States v. Puig*, 810 F.2d 1085, 1086-87 (11th Cir. 1987) (Rejecting argument based on a hole drilled into the plywood section of a ship's hull and saying that defendant's argument "surely overstates the damages wrought by a small hole that could easily be plugged and repaired.  The drilling of the hole was the only means to reach the secret compartment.  The government must be permitted to take such limited steps when it has established a reasonable suspicion of illegal activity.")

authorization" to search the container (or have some other lawful basis for searching it).  *Id.* at 521.

The difference between the drill applied to Mr. Ahumada's sedan and the Leatherman tool that the law enforcement officer applied to the sealed can of methamphetamine in *Osage* is as evident as it is important.  Trooper Nicholas did not "destroy or render useless" Mr. Ahumada's sedan, as the officer did to the can at issue in *Osage*.  *See also United States v. Carbajal-Iriarte*, 586 F.3d 795, 802-03 (10th Cir. 2009) (Court rejected defendant's argument that "the officers exceeded the scope of his consent when they cut open the upholstery of the van seat.  He argues voluntary consent does not include consent to destroy the defendant's property in the course of the search.  *Osage*, however, held only that any officer may not 'destroy or render completely useless a container which would otherwise be within the scope of a permissible search based on general consent alone. . ." (citations omitted)).  The Court is not persuaded by defendant's reliance on *Osage* or his attempt to stretch it to apply to the materially different facts presented here.

Finally, even if the Court concluded that Trooper Nicholas' search exceeded the scope of Mr. Ahumada's consent, the governing law permitted him to drill a small hole in the car's cowl area.  Before he created the hole to view inside the cowl area, Trooper Nicholas had developed probable cause to believe that the defendant's car contained a secret compartment based on facts he gathered before and during the consensual search.  *See Carbajal-Iriarte*, 586 F.3d at 802-03 (officer may lawfully pursue search beyond scope of the defendant's consent if facts obtained during the consensual portion of the search establish probable cause to expand the search); *see also United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990) (officer permitted to cut open defendant's spare tire without defendant's consent because "the officers [had] obtained

26

probable cause to search the tire during the portion of the search to which the defendant did

consent.") (cited approvingly in *Carbajal-Iriarte*).  Trooper Nicholas had developed a reasoned

and articulable basis for suspecting Mr. Ahumada's sedan contained a secret compartment:  He

had found an anomaly in the molding on the passenger side of the front window; the windshield

looked like someone had installed it recently, but the car's owner denied any recent repairs; the

molding did not rest flatly on the car, increasing the likelihood of wind noise and suggesting an

automotive professional had not installed it; the car's cowl panel was held in place by new

screws when an experienced installer would have removed the original screws carefully so that

he or she could reuse them; scratching existed in the push-in clips holding the cowl in place;

someone had repainted the cowl area and they had used a different shade of blue than the factory

had used originally, a variable that a professional installer ordinarily would not have tolerated;

and the windshield installer had used more urethane than a professional installer would have

used.  These specific, fact-based observations by an officer experienced in auto body repair and

windshield replacement, led the Trooper to conclude that the defendant's car likely contained a

secret compartment.[6]  And the Trooper's fact-based suspicion gave Trooper Nicholas probable

cause to search Mr. Ahumada's car.  *See United States v. Stephenson*, 452 F.3d 1173, 1177-78

(10th Cir. 2006).  ("If the vehicle had a hidden compartment, it was highly likely to contain

contraband.  We have found [it] hard to conceive of a legitimate use [for] a large hidden storage

compartment in any vehicle.") (quoting *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238

---

[6] The Trooper's observations, and the suspicion they generated were consistent with other suspicious circumstances, *e.g.*, defendant's extreme nervousness that did not abate during the traffic stop, the defendant's illogical explanation for making a long car trip by himself in a compressed time (driving from California to Kansas City and back for a two-day visit to a sister he had not seen in five years), and defendant's denial that any work had been performed on the car recently despite the appearance of recent work the Trooper saw.

(10th Cir. 2004) (quotation marks omitted).  Such probable cause gave Trooper Nicholas cause to search defendant's car even if defendant had not consented to the search.

### C.  No *Miranda* warning was required before Trooper Nicholas conducted his search.

Finally, Mr. Ahumada argues that Trooper Nicholas was obligated to give him the *Miranda* warning before he searched the vehicle.  *See* Doc. 15 at 25-26.  This argument begins with the premise that the "taint of an illegal stop and illegal detention" required the warning.  *Id*. at 25.

But as the Court has decided already, neither Trooper Nicholas' stop nor his detention of defendant was illegal.  This eradicates the foundation of defendant's argument and it warrants no additional discussion.

### V.      THERE IS NO POISONOUS TREE.

Mr. Ahumada ties his four substantive arguments together in Part V of his Memorandum, which correctly states the governing law.  *See* Doc. 15 at 26-28.  The telling part of this section's argument, however, comes near its end:  "[T]he evidence [against defendant] would not have been discovered but for the illegal stop, detention, search and seizure …."  *Id*. at 28.  The Court has concluded that neither the stop nor the detention nor the search involving Mr. Ahumada was illegal.  This conclusion means that no basis exists to exclude the evidence gathered against him.

### VI.    STATEMENTS OUTSIDE THE SCOPE OF THIS MEMORANDUM AND ORDER

As noted at the outset of this Memorandum and Order, Mr. Ahumada's motion seeks to suppress "all statements made by defendant in connection with the search and seizure of defendant and his car."  Doc. 14 at 1.  At the hearing on his motion, defendant introduced Trooper Clark's "Report of Investigation" as Exhibit 3.  It reveals that Mr. Ahumada waived his

*Miranda* rights and agreed to answer questions in a "POST ARREST INTERVIEW" conducted by KHP Trooper Clark on June 25, 2014.  Exhibit 3 reveals that this interview consisted of three sessions, the first session encompassing Mr. Ahumada's waiver of his *Miranda* rights.

During the second phase of Trooper Clark's consensual post-arrest interview of Mr. Ahumada, the defendant informed the Trooper that he did not wish to cooperate and it would be best if he just went to jail.  Trooper Clark ended this second interview session shortly afterward. Exhibit 3 reveals that Trooper Clark later reinitiated contact and asked permission to ask Mr. Ahumada some more questions.  Exhibit 3 also reveals that Mr. Ahumada "agree[d]" and then answered several more questions asked by Trooper Clark.

The evidence at the hearing, however, did not address the specific circumstances surrounding this reported change of heart.  Namely, the evidence did not reveal whether Mr. Ahumada's termination of his consensual exchange with Trooper Clark's constituted a renewed assertion of his constitutional rights.  Likewise, the evidence did not show whether anyone informed Mr. Ahumada of his *Miranda* rights after any assertion of his rights, and before Trooper Clark renewed his questioning.  The Court cannot determine what issues, if any, are presented by any statements purportedly made during this third and final interview session. Consequently, the Court does not intend this Order to make any ruling about the use or suppression of any such statements.  If the government intends to offer any statements purportedly made by the defendant during this third and final session of the post-arrest interview, it must present those issues by separate motion.  If no such motion is made, the Court will presume any statements purportedly made during that third interview session are inadmissible.

**IT IS THEREFORE ORDERED BY THE COURT THAT**, for the reasons explained in this Memorandum and Order, defendant's Motion to Suppress Evidence (Doc. 14) is denied.

29

**IT IS SO ORDERED.**

**Dated this 18th day of February, 2015, at Topeka, Kansas.**

<u>s/ Daniel D. Crabtree</u>
**Daniel D. Crabtree**
**United States District Judge**